IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| AMSPEC, LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>RICHARD CALHOUN; DUNG HOANG;<br>CARL CRAWFORD; VICTOR BROWN; and<br>CAMIN CARGO CONTROL, INC.,<br><br>    Defendants. | CIVIL ACTION NO.: 4:22-cv-120 |

**O R D E R**

Plaintiff AmSpec, LLC ("AmSpec") filed this lawsuit against four of its former employees, Richard Calhoun, Dung Hoang, Victor Brown, and Carl Crawford, as well as their new employer, Camin Cargo Control, Inc. ("Camin"). (Doc. 1.)  AmSpec claims that the former employees committed numerous unlawful acts when leaving AmSpec's employment to work for Camin, a direct competitor of AmSpec. (Id.)  Pertinently, in Count V of its Complaint, AmSpec alleges that Calhoun, Hoang, and Crawford breached various provisions of their respective employment agreements with AmSpec.[1]  (Id. at pp. 29–32.)  Defendants have filed a Partial Motion to Dismiss seeking dismissal of AmSpec's claim contained within Count V that Defendants violated the employment agreements' noncompete clauses.  (Doc. 34.)  Defendants' Motion has been fully briefed by the parties.  (See docs. 34-1, 40, 42.)  For the reasons set forth below, the Court finds that the noncompete clauses prohibit Defendants from engaging in an unreasonably broad scope of activities.  Therefore, the clauses are unenforceable.  Moreover, the Court declines to edit or

---

[1] Because this Order only discusses one of AmSpec's claims against Calhoun, Hoang, and Crawford, the Court will refer to these three defendants collectively as "Defendants."

"blue-pencil" the noncompete clauses.  Consequently, the Court **GRANTS** Defendants' Motion, (doc. 34), and **DISMISSES WITH PREJUDICE** Plaintiff's claims that Defendants violated the noncompete clauses.

## BACKGROUND

The following pertinent facts are set forth in the Complaint and the exhibits attached thereto. (Doc. 1.)  AmSpec is a New Jersey limited liability company engaged in the business of testing and inspecting petroleum and petrochemicals.  (Id. at pp. 1, 5.)  Calhoun, Hoang, and Crawford all previously worked for AmSpec's office in Savannah, Georgia. (Id. at p. 2.)  Calhoun served as AmSpec's branch manager, Hoang worked as the operations manager, and Crawford was the laboratory supervisor.  (Id.)  As a condition of their employment with AmSpec, each of the Defendants signed identical contracts titled "Agreement Relating to AmSpec's Trade Secrets and Proprietary and Confidential Information" ("the Agreements").  (Docs. 1-1, 1-8, 1-10.)[2] Among other things, the Agreements contained identical clauses ("the Noncompete Clauses") which provided,

> Because of Employer's legitimate business interests as described herein and the good and valuable consideration offered to me, during the term of my employment and for the 12 month period following my termination of employment with AmSpec, for any reason or no reason and whether employment is terminated at the option of me or AmSpec, I agree and covenant not to engage in any Prohibited Activity within any State to which I was assigned to work during my last 12 months of employment at AmSpec.
> For purposes of this non-compete clause, "Prohibited Activity" is activity to which I contribute my knowledge, directly or indirectly, in whole or in part, as an employee, employer, owner, operator, manager, advisor, consultant, agent, partner, director, stockholder, officer, volunteer, intern or any other similar capacity to an entity engaged in the same or similar business as AmSpec, including those engaged in the business of petroleum and petrochemical laboratory, inspection and analysis services.  Prohibited Activity also includes activity that may require or inevitably require disclosure to a third party of trade secrets, proprietary information or Confidential Information.

---

[2] Because the pertinent portions of the Agreements are identical, hereinafter, the Court only cites to the Agreement with Calhoun, (doc. 1-1).

(Doc. 1-1, p. 4.)  The Agreements also provided that they "shall be construed in accordance with the laws of New Jersey without regard to conflicts-of-law principles." (Id. at p. 7.)  Additionally, the Agreements contained severability provisions which stated,

> Should any provision of this Agreement be held by a court of competent jurisdiction to be enforceable only if modified, or if any portion of this Agreement shall be held as unenforceable and thus stricken, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the Parties with any such modification to become a part hereof and treated as though originally set forth in this Agreement.  The Parties further agree that any such court is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement or by making such other modifications as it deems warranted to carry out the intent and agreement of the Parties as embodied herein to the maximum extent permitted by law.
> The Parties expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them.  In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal or unenforceable provisions had not been set forth herein.

(Id. at pp. 7–8.)

In March 2022, Calhoun abruptly resigned from AmSpec and began working for Camin's new Savannah Office.  (Doc. 1, p. 17.)  Nearly contemporaneously with Calhoun's resignation, Brown also resigned from AmSpec and went to work in Camin's Savannah office.  (Id. at p. 18.)  Less than a month later, Hoang and Crawford also resigned their positions with AmSpec for positions with Camin in Savannah.  (Id.)

In Count V of the Complaint, AmSpec claims that Defendants have breached the Agreements in numerous respects through their work with Camin.  (Id. at pp. 29–32.)  As to each of the Defendants, AmSpec claims that "[t]he restrictive covenants contained in the [employee's]

3

Agreement remain in full force and effect, and [the employee], for good consideration, remains obligated to comply with the restrictive covenants. By accepting employment with Camin . . . [the employee] is directly competing with AmSpec and has breached the [employee's] Agreement." (Id. at pp. 30, 31.)

## STANDARD OF REVIEW

When evaluating a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must "accept[] the allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff." Belanger v. Salvation Army, 556 F.3d 1153, 1155 (11th Cir. 2009). However, this tenet "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Rather, "[a] complaint must state a facially plausible claim for relief, and '[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Reese v. Ellis, Painter, Ratterree & Adams, LLP, 678 F.3d 1211, 1215 (11th Cir. 2012) (quoting Iqbal, 556 U.S. at 678). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" does not suffice. Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

The plausibility standard is "not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief" and dismissal is proper. Id. (internal quotation marks and citation omitted). Dismissal under Rule 12(b)(6) is also permitted "when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action."

Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993); see also Neitzke v. Williams, 490 U.S. 319, 326–27 (1989) (explaining that Rule 12 allows a court "to dismiss a claim on the basis of a dispositive issue of law").

## DISCUSSION

### I. Choice of Law

In this diversity action, the Court must apply the choice-of-law rules of its forum state of Georgia to determine which state's substantive laws apply. Boardman Petroleum, Inc. v. Federated Mut. Ins. Co., 135 F.3d 750, 752 (11th Cir. 1998). The claims discussed in this Order sound in contract. "[I]n contract cases, [Georgia] follows the traditional doctrine of lex loci contractus: contracts are 'governed as to their nature, validity and interpretation by the law of the place where they were made' unless the contract is to be performed in a state other than that in which it was made." Id. (quoting Gen. Tel. Co. of Se. v. Trimm, 311 S.E.2d 460, 461 (Ga. 1984)). In addition, "the law of the jurisdiction chosen by parties to a contract to govern their contractual rights will be enforced unless application of the chosen law would be contrary to the public policy or prejudicial to the interests of this state." CS-Lakeview at Gwinnett, Inc. v. Simon Prop. Grp., Inc., 659 S.E.2d 359, 361 (Ga. 2008) (citation omitted); see also Becham v. Synthes USA, 482 F. App'x 387, 390–91 (11th Cir. 2012).

Here, the Agreements contain choice of law provisions, through which the parties agreed that the Agreements "shall be construed in accordance with the laws of New Jersey without regard to conflicts-of-law principles." (Doc. 1-1, p. 7.) However, the parties now concur that the Noncompete Clauses must be construed under Georgia law because Georgia courts would not enforce a restrictive covenant that would contravene Georgia public policy. (Doc. 34-1, pp. 3–4; doc. 40, p. 2 n.1.) Accordingly, the Court will apply Georgia law in this Order. See, Int'l Ins. Co.

5

v. Johns, 874 F.2d 1447, 1458 n.19 (11th Cir. 1989) (where neither party advocated for choice of law provision court will "presume that the substantive law of the forum . . . controls").

## II. Georgia Contract Law

The elements of a breach of contract claim in Georgia are "(1) a valid contract; (2) material breach of its terms; and (3) damages arising therefrom." Brooks v. Branch Banking & Tr. Co., 107 F. Supp. 3d 1290, 1295 (N.D. Ga. 2015). Here, Defendants challenge the first of these elements, and argue that AmSpec "fails to show the existence of a valid non-compete agreement because [the Noncompete Clauses] [are] overbroad and impermissibly restrict[] working in any capacity and in geographic scope." (Doc. 34-1, p. 4.) "The issues of contract construction and enforceability are generally questions of law for a court to resolve . . . ." SunTrust Bank v. Bickerstaff, 824 S.E.2d 717, 722 (Ga. Ct. App. 2019) (quoting Precision Planning, Inc. v. Richmark Cmties., Inc., 679 S.E.2d 43, 45 (Ga. Ct. App. 2009)); see also Kaesemeyer v. Angiogenix, Inc., 629 S.E.2d 22, 24 (Ga. Ct. App. 2006) ("Construction of a written contract is a question of law for the trial court based on the intent of the parties as set forth in the contract."). Specifically, "[w]hether the restraints imposed by an employment contract are reasonable is a question of law for determination by the court." Clark v. Johnson Truck Bodies, LLC, No. CV411-132, 2012 WL 1014827, at *5 (S.D. Ga. Mar. 23, 2012) (quoting Uni-Worth Enters. v. Wilson, 261 S.E.2d 572, 575 (Ga. 1979)).

Under Georgia law, "it is the cardinal rule of contract construction that the court should ascertain the intent of the parties." Davis v. VCP S., LLC, 740 S.E.2d 410, 411 (Ga. Ct. App. 2013) (citing O.C.G.A. §§ 13-2-1, 13-2-3). However, "no construction is required or even permissible when the language employed by the parties in the contract is plain, unambiguous, and capable of only one reasonable interpretation." Walker v. Virtual Packaging, LLC, 493 S.E.2d

6

551, 554 (Ga. Ct. App. 1997) (quoting Bradley v. British Fitting Grp., PLC, 472 S.E.2d 146, 150 (Ga. Ct. App. 1996)).  Additionally, Georgia courts are not permitted to use parol evidence "to add to, take from, or vary a written contract."  O.C.G.A. § 13-2-2(1).

### III.     Interpretation of the Noncompete Clauses

Applying the rules of interpretation set forth above, the Court finds the Noncompete Clauses to be unambiguous.  Each Defendant plainly agreed not to engage in any "prohibited activity" for twelve months after the termination of his employment with AmSpec in any state to which he was assigned during the last twelve months of his AmSpec employment. (Doc. 1-1, p. 4.)  The Noncompete Clauses go on to define "prohibited activity" as "activity to which I contribute my knowledge, directly or indirectly, in whole or in part, as an employee, employer, owner, operator, manager, advisor, consultant, agent, partner, director, stockholder, officer, volunteer, intern or any other similar capacity to an entity engaged in the same or similar business as AmSpec." (Id.)  The parties dispute the meaning and import of the word "knowledge" in the Noncompete Clauses.  Defendants argue that the language "prohibits them from working in any capacity for any entity engaged in the same or similar business as Plaintiff, even if the work is not competitive with Plaintiff's business—including, for example, working as a secretary or janitor." (Doc. 34-1, p. 5.)  AmSpec disagrees and argues that "[w]hile this description of the prohibited activity is generalized, any objective, reasonable person reading that definition understands that 'contribute my knowledge' means contributing the knowledge learned while employed by Plaintiff." (Doc. 40, p. 9.)

Thus, AmSpec argues that when the parties used the word "knowledge," they meant "knowledge the employee learned while employed by AmSpec." (Id.)  Though AmSpec argues that "any objective, reasonable person" would glean this meaning from the Noncompete Clauses,

7

AmSpec provides no argument, much less a reasonable and objective one, in support of this conclusory statement. (Id.) Moreover, the Court sees no support for AmSpec's interpretation in the four corners of the Agreements or elsewhere.

Additionally, there is nothing inherently ambiguous about the word "knowledge." "Both case law and the dictionary tell us that 'knowledge' has historically 'meant and still means the fact or condition of being aware of something.'" Unicolors, Inc. v. H&M Hennes & Mauritz, L.P., ____ U.S. ____, ___, 142 S. Ct. 941, 946–47 (2022) (quoting Intel Corp. Investment Policy Comm. v. Sulyma, 589 U. S. ____, ____, 140 S. Ct. 768, 776 (2020) (internal quotation omitted)) (also citing Black's Law Dictionary 888 (8th ed. 2004); New Oxford American Dictionary 938 (def. 2) (2d ed. 2005); Webster's New College Dictionary 625 (3d ed. 2008)); see also Keller v. SAIF, 27 P.3d 1064, 1069 (Or. Ct. App. 2001) (Lipscomb, J., dissenting) ("The words 'knowledge' and 'injury' are words of common usage, and should be given their plain, natural and ordinary meaning unless the context otherwise requires."); State v. Baugatz, 8 P.3d 125, 2000 WL 782088, *2 (Mont. 2000) ("[M]en of common intelligence must not necessarily guess at the plain meaning of the word 'knowledge' which has a commonly understood meaning.").[3]

---

[3] Nor does the Court find the word "contribute" or the phrase "contribute knowledge" to be ambiguous. As an initial matter, the Court will not engage in any construction of this word or this phrase because AmSpec does not argue that either one is ambiguous or that either one has any special meaning. Even if AmSpec had done so, such arguments would fail. In this context, "contribute" is commonly understood to mean "to give or supply (something, such as money or time) as a part or share." "Contribute." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/contribute (last accessed Dec. 13, 2022); see also City of Martinsville v. Masterwear Corp., No. 1:04CV1994 RLYWTL, 2006 WL 2710628, at *4 n.4 (S.D. Ind. Sept. 20, 2006) ("'Contribute' means 'to give (money, time, knowledge, assistance, etc.) along with others to a common supply, fund, etc. . . . .'") (quoting Webster's Encyclopedic Unabridged Dictionary 234 (1989)); Intrepid Ship Mgmt., Inc. v. Ocean Prospector, No. CV G-12-243, 2015 WL 10557485, at *2 (S.D. Tex. Mar. 6, 2015), report and recommendation adopted, Intrepid Ship Mgmt., Inc. v. Plant Recovery Co., No. 3:12-CV-243, 2016 WL 1274487 (S.D. Tex. Mar. 28, 2016) ("To 'contribute' means to supply.) Likewise, the phrase "contribute knowledge" is ordinarily interpreted to denote the general relaying or supplying of knowledge to others. See, e.g., Greene v. Philadelphia Media Network, Inc., No. PTEMBERTERM201101223, 2014 WL 12746377, at *6 (Pa. Com. Pl. Aug. 1, 2014) ("Experts must *contribute knowledge* that the jurors don't already have.") (emphasis supplied); Kehm v.

Indeed, AmSpec implicitly acknowledges that the word "knowledge" is unambiguous and is commonly understood, as AmSpec uses the word in its proposed construction of the parties' intent. (Doc. 40, p. 9 ("'contribute my knowledge' means contributing the *knowledge* learned while employed by Plaintiff") (emphasis added).) In other words, AmSpec doesn't demonstrate that the word "knowledge" is ambiguous but rather contends that the parties intended to limit the Noncompete Clauses to only cover "knowledge" Defendants learned during the time they were working for AmSpec. However, AmSpec provides no explanation for this contention. Moreover, the face of the Agreements themselves provide no temporal qualification on the meaning of "knowledge." In contrast, the Agreements expressly include temporal descriptions as to other provisions. (See, e.g., doc. 1-1, p. 2 ("*During the course of my employment by AmSpec*, I will have access to and learn about Confidential Information . . . ."); id. at p. 5 ("I agree and covenant not to directly or indirectly solicit, . . . any employee of AmSpec . . *during my employment with AmSpec* and for the 12 month period following my termination . . . ."), ("I agree and covenant, that *during my employment with AmSpec* and during the 12 month period following my termination of

---

Procter & Gamble Co., 580 F. Supp. 890, 909 (N.D. Iowa 1982) ("to deny scientists this opportunity to use these reports and studies would very much deny the scientists the opportunity to *contribute knowledge* and skills or problem-solving in health and other related fields") (emphasis supplied); J. Edwin Dietel, The Production and Use of Knowledge, Corp. Compl. Series: Records Retention § 10:24 (2022) ("As customers increasingly *contribute knowledge* to businesses that they transact with, it is still the business'[s] job to be able to assimilate and integrate this knowledge.") (emphasis supplied); Kay C. Tucker, Taking Action on Documenting Procedures Payroll Guide Newsletter Volume 58, No. 12, (1999) ("Each member *contributes knowledge* and experience of that portion of the process that his or her department actually handles.") (emphasis supplied).

employment with Employer."); id. at p. 8 ("*During the term of my employment with AmSpec*, I agree not to undertake preparations . . .") (emphasis supplied).  Thus, if the parties intended to limit the word "knowledge" as AmSpec contends, they could have done so in the Agreements.[4]

Put simply, because the word "knowledge" in the Noncompete Clauses is plain and unambiguous, the Court cannot add to it or take away from its meaning as AmSpec proposes. Walker, 493 S.E.2d at 554; see also O.C.G.A. § 13-2-2(2) ("[w]ords generally bear their usual and common signification").  Thus, the Court will interpret the Noncompete Clauses just as they are written.  Doing so, the Court finds that the Noncompete Clauses prohibit each of the Defendants from "contribut[ing] [the employee's] knowledge, directly or indirectly, in whole or in part . . . to an entity engaged in the same or similar business as AmSpec."  (Doc. 1-1, p. 4.)  Thus, if the clauses are valid, each Defendant cannot directly or indirectly give or supply to any competitor of AmSpec any of the facts and other things that the Defendant is aware of, regardless of when or how he became aware of them.

## IV.    Validity of the Noncompete Clauses as Written

Having laid out the plain meaning of the Noncompete Clauses, the Court next turns to whether the provisions are valid and enforceable under Georgia law.   Under the Georgia Restrictive Covenant Act ("GRCA"), non-competition clauses are enforceable "so long as the restrictions are reasonable in time, geographic area, and scope of prohibited activities." O.C.G.A. § 13-8-53(a).  However, even after enactment of the GRCA, Georgia law does not allow an employer to restrict a former employee from working for the employer's competitors in any capacity.  As recently explained by the Georgia Court of Appeals, "[a]lthough O.C.G.A. § 13-8-

---

[4] Moreover, the surrounding language within the Noncompete Clauses contradicts AmSpec's limiting interpretation.  The parties intended the provision to have broad application as the clauses seek to prohibit Defendants from contributing knowledge "directly or indirectly, in whole or in part."  (Doc. 1-1, p. 4.)

10

56(3) states that '[t]he scope of competition restricted is measured by the business of the employer[,]' covenants that do not list specific limits on the type of activity, and effectively bar former employees from working in any capacity for competitors, have been deemed overbroad and unreasonable." Burbach v. Motorsports of Conyers, LLC, 871 S.E.2d 63, 66–67 (Ga. Ct. App. 2022) (quoting Carson v. Obor Holding Co., LLC, 734 S.E.2d 477, 483 (Ga. Ct. App. 2012)).

Here, the practical effect of the Noncompete Clauses is a prohibition against Defendants working, consulting, or even volunteering with AmSpec's competitors in any capacity. The Court cannot envision a position in which an employee could work for a company without "contribut[ing] [the employee's] knowledge, directly or indirectly, in whole or in part" to that company. As Defendants point out, the prohibition would apply to work as a secretary or janitor as they would have to indirectly contribute their knowledge of how to operate a computer or a broom to those fill those positions. (Doc. 34-1, p. 5.) The effects are even broader. For instance, the Noncompete Clause's prohibition would apply to any positions where Defendants received customers' orders or complaints as they would "contribute their knowledge" of those orders or complaints by simply relaying them to someone else in the company. Likewise, if Defendants made observations in the field, they would "contribute their knowledge" of those observations to their employer if they logged those observations into the employer's database or relayed them to a coworker. Further, if Defendants attended a meeting and discussed an issue with other employees, they would be "contributing their knowledge" to the discussion, regardless of whether they obtained that knowledge during their schooling or the morning of the meeting.[5] Thus, Defendants are correct that the Noncompete Clause's "contribute my knowledge" restriction

---

[5] To further belabor the point: the Court could not envision a company hiring a potential employee who told the company during his interview, "I will not contribute my knowledge, directly or indirectly, in whole or in part, to your company."

11

"prohibits them from working in any capacity for any entity engaged in the same or similar business as Plaintiff." (Doc. 34-1, p. 5); see also Manganaro Ne., LLC v. De La Cruz, No. CV 18-11364-LTS, 2018 WL 5077180, at *1, *4 (D. Mass. Aug. 22, 2018) (noncompete clause stating that "employee will not directly or indirectly engage in or contribute [her] knowledge and abilities to any business or entity in direct competition with [employer]" "prohibits employee from working, in any way, for any direct competitor to [employer]"); Certainteed Corp. v. Williams, No. 06 C 2992, 2006 WL 1762660, at *8 (N.D. Ill. June 27, 2006), *vacated and remanded on other grounds*, 481 F.3d 528 (7th Cir. 2007) (finding portion of noncompete clause that prohibited employee from "contribut[ing] [employee's] knowledge to any work or activity" that is competitive to employer "prohibits [employee] from engaging in any competing business even when that competition does not involve the use of any confidential information, trade secret, goodwill or unique or extraordinary skills.").

Furthermore, AmSpec acknowledged in its Complaint that the Noncompete Clauses sought to limit Defendants from working with any competitors of AmSpec in any capacity. AmSpec alleged that, "[b]y accepting employment with Camin as Branch Manager of Camin's Savannah office, Calhoun is directly competing with AmSpec and has breached the Calhoun Agreement." (Doc. 1, p. 30; see also id. at p. 31 ("By accepting employment with Camin in Camin's Savannah office, Hoang is directly competing with AmSpec and has breached the Hoang Agreement."); id. ("By accepting employment with Camin in Camin's Savannah office, Crawford is directly competing with AmSpec and has breached the Crawford Agreement."). Tellingly, AmSpec did not claim that Defendants breached the Agreements by contributing knowledge to Camin that they learned while employed with AmSpec. Rather, AmSpec alleged that Defendants violated the Agreements by simply working with Camin.

Because the Noncompete Clauses prohibit Defendants from working in any capacity with any of AmSpec's competitors, their scope is "overbroad and unreasonable." Burbach, 871 S.E.2d at 66–67. Therefore, the clauses as written cannot provide a valid basis for Plaintiff's breach of contract claim.[6]

## V.     Whether the Court Will Blue-Pencil the Noncompete Clauses

The GRCA allows the Court to modify or "blue-pencil" contracts with unreasonable restrictive covenants. Specifically, O.C.G.A. § 13-8-53(d) provides,

> Any restrictive covenant not in compliance with the provisions of this article is unlawful and is void and unenforceable; provided, however, that a court may modify a covenant that is otherwise void and unenforceable so long as the modification does not render the covenant more restrictive with regard to the employee than as originally drafted by the parties.

Additionally, O.C.G.A. § 13-8-54(b) provides,

> In any action concerning enforcement of a restrictive covenant, a court shall not enforce a restrictive covenant unless it is in compliance with the provisions of Code Section 13-8-53; provided, however, that if a court finds that a contractually specified restraint does not comply with the provisions of Code Section 13-8-53, then the court may modify the restraint provision and grant only the relief reasonably necessary to protect such interest or interests and to achieve the original intent of the contracting parties to the extent possible.

However, courts maintain discretion over whether to blue-pencil a noncompete provision, and a decision not to do so will only be overturned for an abuse of discretion. Belt Power, LLC v. Reed, 840 S.E.2d 765, 770 (Ga. Ct. App. 2020) (holding as a matter of first impression that the use of the word "may" in the statute indicated that the provision was discretionary rather than mandatory and that trial court did not abuse its discretion when it declined to invoke blue pencil provision to modify restrictive covenants to make them enforceable). Additionally, "[t]hough courts may strike unreasonable restrictions, and may narrow over-broad territorial designations, courts may not

---

[6] Given the overbreadth of the scope of the Noncompete Clauses' prohibited activities, the Court need not assess Defendants' arguments regarding the clauses' geographic scope.

13

completely reform and rewrite contracts by supplying new and material terms whole cloth." LifeBrite Labs., LLC v. Cooksey, No. 1:15-CV-4309, 2016 WL 7840217, at *7 (N.D. Ga. Dec. 9, 2016); see also Hamrick v. Kelley, 392 S.E.2d 518, 519 (Ga. 1990)) ("The 'blue pencil' marks, but it does not write. It may limit an area, thus making it reasonable, but it may not rewrite a contract void for vagueness, making it definite by designating a new, clearly demarcated area."); Wind Logistics Professional, LLC v. Universal Truckload, Inc., No. 1:16-cv-00068, 2019 WL 4600055, at *10 (N.D. Ga. 2019) (courts "cannot 'reform and rewrite' contracts to make them acceptable to Georgia public policy") (citing LifeBrite Labs., No. 1:15-CV-4309, 2016 WL 7840217, at *7).

As quoted above, in this case, the Agreements' Severability Clauses provide that a court may modify an unenforceable provision of the Agreements if the court deems the modification is warranted to carry out the intent and agreement of the Parties. (Doc. 1-1, pp. 7–8.) However, AmSpec only specifically argues that the Court should blue-pencil the geographic restriction of the Noncompete Clauses if necessary. (Doc. 40, p. 13 ("[I]f the Court believes the geographic restriction is overbroad, the Court can easily narrow the restriction.").) Because AmSpec has not specifically argued that the Court should revise the Noncompete Clauses' scope of prohibited activities, much less offered a proposed revision of that scope, the Court will not do so.[7] See Lamp v. Am. Prosthetics, Inc., 379 N.W.2d 909, 911 (Iowa 1986) (upholding decision to decline to

---

[7] AmSpec has also not asked the Court to strike the "contribute my knowledge" sentence of the Noncompete Clauses and to construct "prohibited activities" to only include "activity that may require or inevitably require disclosure to a third party of trade secrets, proprietary information or Confidential Information." (See doc. 1-1, p. 4.) Because AmSpec has not suggested this revision, the Court will not make it. Moreover, the revision would render the Noncompete Clauses meaningless or contradictory to the "original intent" of the parties spelled out in other portions of the Agreement that already contain specific prohibitions against the disclosure of trade secrets, proprietary information, and confidential information. O.C.G.A. § 13-8-54(b). Further, as AmSpec's other claims sounding in contract, common law, and statutory demonstrate, it is not "reasonably necessary" to revise the Noncompete Clause to afford AmSpec protection of its trade secrets, proprietary information, or confidential information. Id.

modify overbroad restrictive covenant because party never raised the issue); Crossroads ABL, LLC v. Canaras Cap. Mgmt., LLC, 941 N.Y.S.2d 537, 2011 WL 5304148, at *9 (N.Y. Sup. Ct. Nov. 2, 2011) ("There has been no request to modify, or 'blue-pencil' this provision, and I decline to do so *sua sponte*.").

Moreover, even if AmSpec had specifically requested that the Court blue-pencil the scope of the restricted activities, the Court would not do so. The only conceivable revision that the Court can glean from AmSpec's brief would be a revision so that Defendants are prohibited from "contributing the knowledge learned while employed by Plaintiff." (Doc. 40, p. 9.) However, nothing indicates that this was "the original intent of the contracting parties." O.C.G.A. § 13-8-54(b). To the contrary, as laid out above, the plain language of the Noncompete Clauses demonstrates that the parties intended for Defendants to be prohibited from contributing any knowledge to AmSpec's competitors. Thus, adding the language "learned while employed by Plaintiff" to the Agreements would create a limitation "whole cloth" and the Court would be rewriting the agreements to save an otherwise unenforceable clause. Moreover, other portions of the Agreements already provide specific restrictions on the use of certain knowledge gained by Defendants during their employment with AmSpec. For instance, the first clause of the Agreements contains an expansive and exhaustive prohibition against the disclosure of AmSpec's confidential information that Defendants accessed and learned during their employment. (Doc. 1-1, pp. 2–4.) The prohibitions within this clause "continue during and after [the employee's] employment by AmSpec until such time as such Confidential Information has become public knowledge . . . ." (Id.) Thus, revising the Noncompete Clauses to prohibit Defendants from contributing knowledge gained during their AmSpec employment for a year would perhaps contradict the parties' specific intent and agreements already spelled out in the Confidential

15

Information Clauses.[8]  Moreover, given the protections already afforded to AmSpec by the Agreements' other clauses, as well as the statutes and common law protections cited in AmSpec's Complaint, the Court fails to see how revising the agreement is "reasonably necessary to protect [AmSpec's] interest or interests."  O.C.G.A. § 13-8-54(b).

For all these reasons, the Court declines to blue-pencil the Noncompete Clauses.  Thus, the scope of activities prohibited by the clause remains unreasonable, and the clause is unenforceable.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendants Calhoun, Hoang, and Crawford's Partial Motion to Dismiss, (doc. 34), and **DISMISSES WITH PREJUDICE** AmSpec's claims that these Defendants violated the Noncompete Clauses.[9]

The Court previously provided the parties an opportunity for expedited discovery and stated that the Court would set a schedule for the filing of briefs regarding AmSpec's Motion for a Preliminary Injunction, (doc. 7).  Given the content of this Order and the discovery that has been obtained to date, AmSpec should be afforded the opportunity to file an Amended Motion for

---

[8] Further, it would be difficult to enforce the Agreements with this revision.  The Court would have to assess when each Defendant obtained each piece of knowledge he was contributing, i.e., whether he learned the information at the time he was employed with AmSpec or during some other time in his life.  Given the breadth of the term "knowledge," the many sources from which someone could obtain knowledge, and the iterative process of accumulating knowledge, this task could prove impossible.

[9] AmSpec states in its response that "if the Court believes the facts are insufficient as stated in the Verified Complaint, the Court should dismiss without prejudice to allow Plaintiff to refile an amended verified complaint to add in additional facts."  (Doc. 40, p. 3 n.2.)  "However, this thinly veiled request for leave to amend is legally insufficient and therefore due to be denied.  Pursuant to [Federal Rule of Civil Procedure 7], and Eleventh Circuit precedent, a request for affirmative relief must be presented to the Court in a motion."  Root v. Kling, No. 3:20-CV-118-J-34JRK, 2020 WL 1476741, at *1 (M.D. Fla. Mar. 26, 2020); see also Newton v. Duke Energy Fla., LLC, 895 F.3d 1270, 1277 (11th Cir. 2018) ("[W]here a request for leave to file an amended complaint simply is embedded within an opposition memorandum, the issue has not been raised properly.") (quotations and citations omitted).  Moreover, the Court's above ruling is not based on an incomplete allegation of facts.  Rather, the plain language of the Agreements establishes the Noncompete Clauses' invalidity.  Thus, even if AmSpec had requested leave to amend, any such amendment would be futile.

Preliminary Injunction. Therefore, the Court **DISMISSES AS MOOT** AmSpec's Motion for Preliminary Injunction. (Doc. 7.) If AmSpec still desires preliminary injunctive relief, AmSpec shall file an Amended Motion for Preliminary Injunction on or before **January 9, 2023**. Defendants shall file any Response to AmSpec's Amended Motion within **twenty-one (21) days** of the filing of AmSpec's Amended Motion.

**SO ORDERED** this 16th day of December, 2022.

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA